```
            IN THE UNITED STATES DISTRICT COURT
          FOR THE WESTERN DISTRICT OF TENNESSEE
                       WESTERN DIVISION
```
_____

UNITED STATES OF AMERICA,       )
                                )
        Plaintiff,              )
                                )
vs.                             )      No. 09-20312-JPM-dkv
                                )
LANDREO LURRY,                  )
                                )
        Defendant.              )
_____

    REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION TO SUPPRESS
_____

The defendant, Landreo Lurry, has been charged in a one count indictment with possessing a gun as a convicted felon on August 12, 2009, in violation of 18 U.S.C. 922(g).  Before the court is the February 25, 2010 motion of Lurry, to suppress any and all physical evidence, statements of the defendant, or observations of law enforcement obtained during or as a direct or indirect result of a traffic stop conducted on August 12, 2009 near the intersection of Holmes and Macon in Memphis, Tennessee.  The government filed a timely reply in opposition.  The motion was referred to the United States Magistrate Judge for report and recommendation.

The court held an evidentiary hearing in this matter on June 17, 2010.  At the hearing, the government called three (3) witnesses: (1) John Harvey; (2) Officer Kevin Williams; and (3) Officer Joseph Johnson.  Lurry called only one witness, his father, Mr. Charles Lurry, and introduced four (4) photos of the intersection at which the stop took place, two photos of the

Lurry's father's home, and the Memphis Police Department's record of arrest as exhibits.

As grounds for the motion to suppress, Lurry contends that the search of the vehicle he was operating violated his constitutional rights under the Fourth Amendment in the following ways: (1) he was stopped without reasonable suspicion or probable cause; (2) the officers searched his car without a warrant and without his consent; and (3) no exigent circumstances existed to justify the officers' search.  In response, the government argues (1) Lurry was lawfully stopped and detained pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968); (2) the officers had probable cause to search Lurry's vehicle based on shotgun shells in plain view; and (3) Lurry's statements should not be suppressed because his statements were voluntary and unsolicited by law enforcement officials.

After careful consideration of the statements of counsel, the testimony of the witnesses, the evidentiary exhibits, and the entire record in this case, this court submits the following findings of fact and conclusions of law and recommends that the motion to suppress be denied.

### I.   PROPOSED FINDINGS OF FACT

On August 12, 2009, around 9:00 pm, MPD Officers Williams and Hazelrig were patrolling the area of Macon and Holmes in Memphis in a cruiser equipped with Automatic License Plate Recognition ("ALPR") technology.  The government called John Harvey, systems

manager for the MPD's real-time crime center and developer of the ALPR software utilized by the MPD, to testify about the system used by the officers on that date. Harvey explained that the ALPR system takes an image of a license plate and converts the image to a digital format based on the identifying characters on the license plate. The system then compares the information captured in the digital format to a nationwide database of stolen vehicles. The system also uses the license plate information to search local databases to determine the home address of the vehicle's owner and whether there are any outstanding warrants or unpaid fines associated with individuals registered to that address.

If a match is made, the system gives both an audio and visual alert to the officer in the cruiser, and the officer is then able to access the information in the database concerning the alert such as the nature of the warrant or offense as well as the name, address, and description of the suspect. Harvey testified that approximately seventy-two (72) of the MPD's police cruisers are currently equipped with the ALPR system, and that the system in the officers' vehicle in this case was in good working order. He further testified that the day before the hearing, a test run of the officers' ALPR system using the license plate number of the vehicle driven by the defendant accurately revealed that someone associated with the vehicle's registration address possessed two outstanding citations for driving on a suspended license on the

night of the stop.  Harvey stated that warrant information was not currently available for the date of the stop because the databases which the system searches do not keep records of arrest warrants once they have been executed.  In addition, Harvey testified that the ALPR system does not have the capability to store scans for later review on a long-term basis at this time.

The government next called Officer Kevin Williams.  Officer Williams testified that he and his partner, Officer Hazelrig, initiated a traffic stop of a Chevrolet Cavalier, being driven at the time by Lurry, after their ALPR system alerted that the driver of the vehicle possibly had a warrant.  Officer Williams stated the ALPR system revealed the warrant was for a "male black" and that by shining the cruiser's spotlight into the vehicle, he and Officer Hazelrig were able to discern that the car contained only one occupant, a black male.[1]  Officer Williams also testified that the vehicle continued for a few blocks after he activated his blue lights and that he noticed the driver of the vehicle making furtive movements and nudging on the driver's side door, which led Officer Williams to suspect the driver might to attempt to run after stopping.  Officer Williams stated that Lurry brought the vehicle to a complete stop just before the intersection of Holmes and

---

[1] Testimony later revealed that vehicle being driven at the time by the defendant belonged to Lurry's girlfriend, Jennifer Barker.  Testimony also revealed that the warrant was not for the defendant but for Ms. Barker's brother.

4

Rosemond and that Officer Williams immediately exited his cruiser and ran to the driver's side of the vehicle to prevent Lurry from escaping and instructed him to "calm down" as he reached the driver's side of the vehicle.

Williams testified that Lurry got out of the car and immediately began explaining that his license was suspended. Officer Williams then grabbed the back of Lurry's pants to keep him from running and performed a pat down search of Lurry while standing next to the vehicle Lurry was driving.  As Officer Williams patted Lurry down, according to his testimony, he noticed a Kroger-type grocery bag filled with shotgun shells lying on the back seat of Lurry's vehicle in plain view.  Officer Williams then took Lurry to his cruiser and placed him in the back of the vehicle unhandcuffed and informed Officer Hazelrig that he suspected there may be a shotgun in Lurry's car.  Officer Williams asked Officer Hazelrig to run a search for information on Lurry and then returned to Lurry's vehicle to conduct a search.  Officer Williams stated that his search revealed a shotgun lying underneath the front passenger seat of the vehicle but he did not remove it.  He testified that the shotgun was not visible from outside the vehicle but that he opened the passenger side door and look underneath the front seat to see it.

After finding the shotgun, Officer Williams returned to the squad car to place Lurry under arrest.  Officer Williams testified

5

that when he opened the door of the squad car, Lurry attempted to escape by fighting with Officer Williams as Officer Williams tried to handcuff Lurry and that during the struggle, Lurry stated continuously, "I'm not going to jail."  Officer Williams also testified that during the struggle, Lurry's father arrived at the scene and pleaded with his son to stop resisting arrest.  Officer Williams testified that he and Officer Hazelrig were eventually able to subdue Lurry and get him in handcuffs, but not before multiple other officers, including Officer Joseph Johnson, arrived on the scene.  Officer Williams stated that after the struggle he became ill, vomited many times, and had to lie down in the grass away from the scene to regain his composure.

On cross examination, counsel for Lurry introduced the MPD arrest ticket, which the court admitted into evidence over the government's objection.[2]  Officer Williams testified that he did not write the arrest ticket due to illness and fatigue resulting from the struggle with Lurry, but that Officer Johnson had authored the arrest ticket based on what Officers Williams and Hazelrig told him.  The government objected to the admission of the arrest ticket based on hearsay, which is excluded by Rule 802 of the Federal Rules of Evidence.  The court, however, finds that the arrest ticket fits within the hearsay exception for government reports found in Rule 803(8).  That exception explicitly allows a criminal

---

[2] The arrest ticket was marked Exhibit 6.

defendant to introduce "factual findings resulting from an investigation made pursuant to authority granted by law." FED. R. CIV. P. 803(8)(C). To overcome the exception, the government must show that "the sources of information or other circumstances indicate a lack of trustworthiness." *Id.*; *Miller v. Field*, 35 F.3d 1088, 1090 (6th. Cir. 1994). Because the court finds the officers to be a trustworthy source of information, the court reaffirms its decision to admit into evidence the MPD arrest ticket authored by Officer Johnson.

Officer Williams admitted during cross examination that the arrest ticket did not state that he had seen the bag of shotgun shells prior to detaining the defendant. The court notes that the arrest ticket reflects that Officer Williams placed the defendant under arrest before observing the shotgun shells in plain view, rather than observing the shotgun shells during the pat down search of the defendant. Nevertheless, the arrest ticket corroborates Officer Williams's testimony that the shotgun shells were lying in plain view on the back seat of the defendant's vehicle. In addition, Officer Williams acknowledged that the arrest ticket reflects that the search of the defendant's vehicle was conducted as an inventory search before towing. Officer Williams denied ever calling a tow truck and disputed the characterization of the search as an inventory search.

The government's final witness, Officer Johnson, testified that when he arrived on the scene, Officers Williams and Hazelrig were still struggling with the defendant as he resisted their attempts to place handcuffs on him.  After Officer Hazelrig successfully handcuffed Lurry, Officer Johnson placed Lurry in the back of his squad car and returned to speak to Officer Williams.  Officer Johnson stated that after speaking with Officer Williams, he then walked to Lurry's car to look inside.  As he approached the vehicle, he observed a clear grocery bag filled with shotgun shells sitting in plain view on the back seat of Lurry's vehicle.  Officer Johnson testified that he then looked under the front seat of Lurry's vehicle and located a sawed-off shotgun on the front passenger side with the butt or handle of the weapon sticking out.  Officer Johnson stated that he removed the shotgun from the vehicle and that as he attempted to unload the gun, Lurry blurted out "tell him to push the button on the top."  Officer Johnson testified that by following this advice he was able to successfully unload the weapon.  Finally, Officer Johnson testified that after he disarmed the shotgun, Lieutenant Hully arrived on the scene and assigned Officer Johnson to write the arrest ticket, which he did based on the information supplied to him by Officers Williams and Hazelrig.

Lurry called his father, Charles Lurry, to testify on his behalf. According to Mr. Charles Lurry, on the night of August 12, 2009, a neighbor called to tell him that the police had stopped his

son's vehicle at the intersection just in front of Mr. Charles Lurry's home. He immediately walked to the intersection of Rosemond and Holmes where he saw blue police lights flashing. As he arrived on the scene, Mr. Charles Lurry saw the officers placing his son in the squad car. Mr. Charles Lurry testified that he spoke with Officer Williams, who informed him that his son was driving on a suspended license, but that the officers were going to let him go after giving him a citation. Mr. Charles Lurry told Officer Williams that he needed the vehicle because it belonged to his son's girlfriend who needed the vehicle to get to work and that Officer Williams indicated that he would allow Mr. Charles Lurry to take possession of the vehicle. Mr. Charles Lurry testified neither officer mentioned the presence of any weapons or ammunition in the vehicle at that time.

After his brief conversation with Officer Williams, Mr. Charles Lurry observed Officer Williams go to the vehicle, open the driver's side door, and look into the car. Officer Williams then went to the passenger side of the car, opened the passenger door to look inside, and stated that he had found a shotgun under the seat. Officer Williams then told Mr. Charles Lurry that his son was going to jail and walked back to the squad car to arrest Lurry. A "tussle" ensued between the officers and Lurry. During the tussle, Mr. Charles Lurry attempted to calm his son down, but kept his distance so as not to become a part of the struggle. By the time

the officers had his son in handcuffs, multiple additional officers had made the scene. Mr. Charles Lurry continued to speak with both Officer Williams and an unnamed lieutenant about getting possession of the car. Eventually, the lieutenant released the vehicle into Mr. Lurry's possession, and Lurry was transported to jail.

The court finds all the witnesses' testimony to be credible. The testimony of both John Harvey and Officer Johnson were unchallenged by Lurry. In addition, the court finds Officer Williams' testimony credible as to the fact that he observed the shotgun shells in plain view on the back seat of the vehicle prior to searching Lurry's vehicle. The court finds no discrepancies between the testimony of Officer Williams and Mr. Charles Lurry concerning this point. The fact that Officer Williams did not mention the shotgun shells to Mr. Charles Lurry during their brief exchange does not render false Officer Williams's testimony concerning his observation. Officer Williams was under no duty to disclose any information to a bystander not involved in the investigation and therefore his failure to mention his findings to Mr. Charles Lurry is not controlling. Moreover, Officer Williams unequivocally testified that he observed the shotgun shells in plain view on the back seat of the vehicle. Officer Williams' testimony that he could see into the vehicle at night is believable because the street was lit by streetlights and the flashing lights on the officers' vehicle. Regardless of whether Officer Williams

observed the bag of shotgun shells during the pat down search of Lurry or as he approached the vehicle after detaining Lurry in the police cruiser, the court finds Officer Williams' testimony that he observed the shells in plain view and prior to searching Lurry's vehicle to be uncontroverted and therefore adopts this testimony as fact.

## II.  PROPOSED CONCLUSIONS OF LAW

The Fourth Amendment prohibits warrantless searches and seizures, and any search conducted without a warrant is considered "per se unreasonable". U.S. CONST. amend. IV; *United States v. Roarke*, 36 F.3d 14, 17 (6th Cir. 1994)(quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)). The Fourth Amendment's requirement of probable cause and a warrant is, however, subject "to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967). The burden is on the government to prove the existence of one of these exceptions by a preponderance of the evidence. *Coolidge v. New Hampshire*, 403 U.S. 443 (1951); *United States v. Matlock*, 415 U.S. 164 (1974). Finally, when a person claims that his or her Fourth Amendment rights are violated during a traffic stop, the analysis must focus on the reasonableness of the officers' actions as determined by examining the totality of the circumstances. *Ohio v. Robinette*, 519 U.S. 33, 39 (1996).

A.  *Terry* Stop

The fundamental inquiry under *Terry* is whether officers "have a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417-18 (1981). This requirement of a particularized suspicion encompasses a two-step inquiry. *Id.* at 418. First, the assessment must be based on the totality of the circumstances known to the officers at the time of the stop. *Id.; see also United States v. Montero-Camargo*, 208 F.3d 1122, 1130 n.11 (9th Cir. 2000) (citing *United States v. Robert L.*, 874 F.2d 701, 703 n.2 (9th Cir. 1989)). Second, that assessment must "arouse a reasonable suspicion that the particular person being stopped has committed or is about to commit a crime." *Montero-Camargo*, 208 F.3d at 1129-30 (6th Cir. 2000) (citing *Cortez*, 449 U.S. at 418, and *Terry*, 392 U.S. at 21 n.18). In other words, "reasonable suspicion requires particularized suspicion." *United States v. Wardlow*, 528 U.S. 119, 124 (2000). The suspicion must be more than an "inchoate and unparticularized suspicion" or a "hunch" that criminal activity is afoot. *Id.* at 123-24.

Here, the license plate reader's alert raised a reasonable, particularized suspicion that the driver of the vehicle was involved in criminal activity. The court notes that neither party has pointed to case law upholding the validity of the ALPR system used by the officers in this case or its equivalent and the court's

own research has produced no cases on point.  Nevertheless, given the testimony of John Harvey concerning the capabilities of the ALPR software and the functionality of the system used by the officers in this case, the court finds the alert by the ALPR system to be a sufficient basis for the reasonable suspicion necessary to support a *Terry* stop.  As the Supreme Court said in *United States v. Hensley*, 469 U.S. 221, 229 (1985), "[W]here the police have been unable to locate a person suspected of involvement in a past crime, the ability to briefly stop that person, ask questions, or check identification in the absence of probable cause promotes the strong government interest in solving crimes and bringing offenders to justice."  In addition to the officers' ALPR system alert, the officers also observed the driver of the vehicle making furtive movements as they attempted to pull the car over, and Officer Williams stated the driver's motions toward the driver's side door made it appear as though the driver would try to run from the scene upon stopping.  In light of the ALPR system alert and the officers' observations, the court finds it was not unreasonable for the officers to stop the defendant and to detain him in order to investigate further.

B.    <u>Warrantless Search</u>

The defendant contends that officers' warrantless search of his vehicle violated his Fourth Amendment right against unreasonable searches and seizures.  The government contends that

the officers did not violate the defendant's Fourth Amendment rights by observing the shotgun shells in plain view, and that, under the totality of the circumstances, the existence of the shotgun shells gave the officers probable cause to conduct a full search of the defendant's vehicle.

All government searches and seizures must be supported by probable cause. *Maryland v. Pringle*, 540 U.S. 366, 369 (2003). In the case of an automobile, officers may dispense with the general warrant requirement and search a vehicle, lawfully stopped, if the search is based upon probable cause. *United States v. Ross*, 456 U.S. 798, 823 (1982); *United States v. Pasquarille*, 20 F.3d 682, 690 (6th Cir. 1994). "Probable cause is defined as reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion, and is found to exist when there is a fair probability that evidence of a crime will be located on the premises of the proposed search." *United States v. Jackson*, 470 F.3d 299, 306 (6th Cir. 2006).

"'It has long been settled that objects falling in the plain view of an officer who has a right to be in the position to have that view are subject to seizure . . . .'" *Fox v. Mich. State Police Dep't*, 173 F. App'x 372, 377 (2006) (unpublished) (quoting *Harris v. United States*, 390 U.S. 234, 236 (1968)). The presence of weapons or ammunition inside a vehicle and in plain view of law enforcement officials may give rise to probable cause to arrest an

14

individual and perform a search his or her vehicle.  *See e.g., United States v. Pearce*, 531 F.3d 374, 381-82 (2008) ("After [the officer] observed a gun magazine in plain view on the passenger-side floorboard of the car which [the defendant] had just exited, the police clearly had probable cause to arrest Pearce and to search the vehicle."); *Fox*, 173 F. App'x at 377 ("Because the officers could see the illegal switchblade in plain view, they had probable cause to search and arrest [the defendant]."). *See also United States v. Wells*, 100 F. App'x 440, 444 (2004) ("[The officer's] observation of the crack cocaine in plain view in the defendant's vehicle, while defendant was being lawfully detained pursuant to the traffic stop, afforded . . . the officers probable cause both to search defendant's vehicle to retrieve the contraband and to arrest defendant for violating the state drug laws.").

 Here, Officer Williams' stated that he observed the shotgun shells in the back seat of Lurry's vehicle in the process of detaining Lurry during the lawful traffic stop.  Testimony given at the hearing corroborates the fact that Officer Williams made the observation at least at some point prior to searching Lurry's vehicle. When he observed the shotgun shells, Officer Williams was lawfully present outside of Lurry's vehicle.  This lawful observation afforded the officers probable cause to search the vehicle.  Therefore, the officers search was reasonable under the Fourth Amendment.

15

C.    <u>Lurry's Statements</u>

Lurry seeks to suppress his statement based on the "fruit of the poisonous tree" doctrine.  The defendant has not alleged a failure on the part of the officers to give a *Miranda* warning or any coercion on the part of the officers.  From the testimony at the hearing, the court concludes that Lurry's statement was voluntarily made and was not in response to any question.  Because the court finds that the search of the Lurry's automobile was lawful under the Fourth Amendment, the court finds no reason to address the defendant's arguments under the "fruit of the poisonous tree" doctrine. Having found the search valid, the court finds no basis to suppress Lurry's voluntary statement.

## III.   RECOMMENDATION

The court recommends that Lurry's motion to suppress be denied and that the government be allowed to introduce evidence obtained as a result of its search of Lurry's vehicle, including the shotgun, the shells, and Lurry's statements.

Respectfully submitted this 23rd day of June, 2010.

<u>s/Diane K. Vescovo</u>
DIANE K. VESCOVO
UNITED STATES MAGISTRATE JUDGE

ANY OBJECTIONS OR EXCEPTIONS TO THIS REPORT MUST BE FILED WITHIN FOURTEEN (14) DAYS AFTER BEING SERVED WITH A COPY OF THE REPORT.  28 U.S.C. § 636(b)(1)(C).  FAILURE TO FILE THEM WITHIN FOURTEEN (14) DAYS MAY CONSTITUTE A WAIVER OF OBJECTIONS, EXCEPTIONS, AND FURTHER APPEAL.
ANY PARTY OBJECTING TO THIS REPORT MUST MAKE ARRANGEMENTS FOR A TRANSCRIPT OF THE HEARING TO BE PREPARED.